So we're aware of the unusual situation in which we have an appellant and appellee joining together to split 15 minutes of the appellant's opening time. So we'll hear first from Mr. Ephraim, I believe, and then we'll hear from Mr. Leifer after that. And you may each reserve time for rebuttal, but your collective time is 15 minutes. Thank you. You may proceed. Good morning. Good morning. May it please the Court, Your Honor. We have intended to reserve his five minutes for rebuttal and give my initial 10 if that's all right. Your Honor, I'm Alex Ephraim. I'm an attorney with Fetterman & Sherwood here with William B. Fetterman from Oklahoma City on behalf of appellant Aurora Rosario in this matter. Your Honor, this plaintiff seeks the reversal of the district court's dismissal order because it erred when it accepted as evidence sufficient to support an inference of citizenship the stale, unverified, last known mailing addresses collected by defendant PIH in ruling that the intervener met his burden to invoke the CAFA discretionary exception. Additionally, Your Honors, the court erred in making its calculation here of putative class members in a way that violated the CAFA statute. First, the lower court's acceptance of stale, unverified, last known mailing addresses as evidence of citizenship in this case is dubious. Counsel, why doesn't Adams teach us the opposite of what you're saying, that addresses may very well be a proxy for residency and for citizenship in the state, at least for domicile purposes, and why wouldn't that be particularly true of a class that consists of people who are getting medical care, which presumes that they haven't necessarily traveled from Oklahoma City to be where they are? Yes, Your Honor. First, the court in Adams acknowledged that last-known mailing addresses are not a direct proxy for residents and residents not a direct proxy for citizenship, and yet the addresses in this case were treated not only as a direct proxy for residency and for domicile and for citizenship here. The Adams court also had additional evidence in the record to support the use of those mailing addresses when compared to this case and the mailing addresses at issue here. The mailing addresses in Adams were, it was an employee class, so they also went through some sort of employment verification process, which was also attested to, and that's in the record in Adams. Well, certainly they're not identical, but given the nature of this class, why isn't it completely reasonable to infer, factually, that most, at least, of these residents' addresses are still valid and that most of them represent California citizens? Well, Your Honor, I want to first start by clarifying that the collection of the address information here was not a collection of residential address information. It was billing information. Your Honor, it was used for billing purposes, but there's nothing in the record that supports how effective that was, and furthermore, PIH is a charitable hospital that loses a They still want their money. I mean, that's a reasonable inference for sure, isn't it? Your Honor, I would disagree that it's a reasonable inference that they were, since they were simply used for billing records, that that means they're accept, that they're acceptable for inferring citizenship in this case. But Mr. E, given the, I guess what we've called the cushion here, I mean the size of the class identified here is at least, you know, double or more the the size that you'd need for the discretionary exemption. So as you're, as the district court's deciding between these two inferences, I mean, how can you show that it's actually more likely that out of all of these inferences that most of them are not where people live, that most of them are non-citizens? Your Honor, I would first admit that it's intervener's burden to establish the citizenship of at least a third of the putative class here, and while I think the district court met that burden, and I mean, what's our standard of review of the district courts? Well, I think the standard of review on this particular issue is clear error. So there we go, we've got two inferences. I mean, now it's your turn. Yeah, as I read the district court, it isn't a hundred percent clear. I'll give you that, but it appears to me that the district court found that 99.58 percent of the settlement class had California addresses, which, you know, would equate to some, like, 164,000 people. And even if you say that some percentage of those are not citizens, you still end up with probably two-thirds of the folks. It's very similar to the Adams cushion, isn't it? I would disagree that it's similar to the Adams cushion because of the error in the court's calculation utilizing that 165,000 number. Yes, but my point is, even if we agree with you, his percentage of 165,000 yields a very, very large number, about 164,000 people, which is still, if you put it against the entire class of nearly 200,000, is still way more than a third. Yes, it would be way more than a third. I'm not going to belabor that point, Your Honor. I would address that the court's 165,000 number was improper under 1332 D7. I'm not arguing with you on that. I guess I'm saying that why wouldn't that be harmless error or irrelevant to the ultimate conclusion, given the finding that the district court made of how many people were local, even if we assume that it should have looked at the full 200,000. Well, Your Honor, what you consider to be an inference, I consider to be guesswork of what is a proposition that's likely on its face under Mondragon. I think it is a proposition likely on its face that a third of the class here may be California citizens, but that the mailing addresses, which were the only evidence put forth in the record to support a finding of citizenship here, is insufficient under the district court's precedent. That's still more than we had in either Mondragon or King. Sorry, Your Honor. We have mailing addresses. We have these additional facts that Judge Graber talked about, about the nature of the business here. So I guess I'm still not seeing why this gets us in Adams' territory. Mondragon, they had no evidence at all. King involved a bare stipulation. Yes, Your Honor. So again, I'm not sure how this is distinguishable from Adams in terms of the quantum of proof available. Well, Your Honor, our contention is that the mailing addresses here are simply not evidence of citizenship, able to support an inference of citizenship. So the competing evidence would be that of, let's assume now that we're supposed to be looking at, the denominator here should be the complaint class rather than the settlement class. The competing inference would be that the majority, I think if my math is right, that the majority of people that they serve are non-citizens of California. Yes, Your Honor, that would be the inference. But again, I fall back to the fact that we have a proposition that appears likely on its face here regarding the citizenship of the putative class. But the evidence put forth in the record, which there must be evidentiary facts in the record to support a finding of citizenship under Ninth Circuit precedent, has not been met here. What was the nature of some of the change of address checks or check that was run during this process? So regarding the national change of address search, that check was done either at the very end of 2019 or the very beginning of 2020 before the 165,000 mailings went out. And out of that change of address, we know that at least over 16,000 of those mailings were returned undeliverable. And again, Your Honor, I've come back to the change of address does not speak to the citizenship of the putative class. The burden should not be exceptionally difficult to bear. That's well-established in Ninth Circuit precedent. We just think that the intervener, the proposed intervener here failed to put forth evidence in the record to support a finding of citizenship. Yeah. We are entitled, if we exercise our discretion to do it, to take judicial notice of certain facts. And why couldn't we take judicial notice of the statistics of non-citizens in the geographic area that is served by the hospital, which is something like 14.5 percent? And why isn't that an appropriate way to consider what the district court implicitly found? Well, Your Honor, I think if the court were inclined to take judicial notice of that fact, it would be entitled to do so. But the evidence was not put forth in the record and is still not in the record as of now to support that finding of citizenship for the putative class. And when we're talking about citizenship, U.S. citizenship doesn't cut it, right? We need to find citizens of the state as well. So we're back to the residency question. Yes, sir. Specifically domicile, actually. And as the court in Adams held, residency is not a direct proxy for domicile, which in turn is not a direct proxy for citizenship. And I just think it's a stretch to, in this instance, when the mailing addresses are stale and unverified, many as old as five years old, and the information collected was not seeking permanent address information, that change occurred after the data breach, that the mailing addresses here are simply not sufficient to support an inference of domicile or citizenship of California class members. I understand you'll reserve the rest of your time for rebuttal. Is that how you'd like to proceed? Yes. Okay. Thank you, Mr. Fran. Thank you. Okay. I thought you were going to reserve the time for rebuttal. So we'll hear from you in a moment. We'll hear from Mr. Maya. Good morning, Your Honor. May it please the court, I am Theodore Maya, here on behalf of appellee Ferdinand Rivera. And preliminarily, we did file some objections. We're going to put 15 minutes on the clock for Mr. Maya. Thank you. Thank you. Make sure you have your full amounts. I appreciate that. My apologies. I appreciate that. Actually, on that note, you know, we did lodge objections to PIH's notice of intent to appear and argue today. And the gravamen of those objections is that, you know, the central argument on appeal advanced by Ferdinand Rivera is that – I'm sorry, by Aurora Rosario is that she somehow was excluded by the district court from an opportunity to brief the issue of application of the discretionary home state exception. That argument simply cannot apply to PIH, right, who actually did submit a brief. I didn't hear them relying on that argument at all in their opening, so I'm not sure. Rosario's opening. Yeah, that's interesting. But that's in the brief, in the briefing, you see that front and center, right? And I don't know – PIH does not have that argument. I don't really know what PIH is going to say. I would request the opportunity to reserve a couple minutes to respond to anything new that PIH and their counsel – Let's see how it goes on that. They've reserved their time, and so it's an odd situation where they're here together because they'd like to see this class settlement approved. And obviously you're representing the intervener, and you want to see all this take place in state court where you already have litigation pending. So why don't we hear from you on the merits of the district court's decision? Yes, and I appreciate that, Your Honor. We did hear Rosario's counsel there call the – essentially assert that the district court's opinion here was not based on any evidence, and I think that just flies in the face of reality, frankly. It also is wrong to call these stale, unverified, last known mailing addresses. What about the D7 problem issue that was raised that the statute here tells us to look at the complaint for making these determinations, and the district court appears to have relied on the settlement class? Sure. First of all, I don't think anybody could say it was clear error for the district court to rely on – to use the number of settlement class members. Counsel, that's not a factual question. It's a legal question as to what is the denominator. So why would we review that? Well, then I think it could be – For clear error. Sure. Okay. It couldn't be an abuse of discretion for the district court. If it's a legal question, we have to know for review of legal questions. I don't see why any other standard of review would apply to the resolution of that legal question should we decide that we need to rule on it. Okay. That may well be, Your Honor, but at the end of the day, it is harmless error. Let me explain why. If we're talking about the size of the class pled in the complaint, the evidence in the record before the court here shows that that's about 198,000-plus people who were affected by the data breach. The address info that we have that was used to provide notice of the data breach covered 165,000, roughly, of those class members, only 701 of whom had addresses outside of California. That address info was not stale. It was confirmed through a national change of address search shortly before those notices were mailed in 2020. There's evidence in the record that PIH uses this address data to provide – When the change of address search was run, some number of addresses were proven 16,000. What happened in that process? I think those 16,000, actually, that wasn't a result of the NCOA search. That was after they were mailed. They were returned as undeliverable, which could be for any number of reasons. I know I actually have trouble receiving mail at my house for some reason. The deposition testimony established that PIH uses this information for billing purposes. PIH did use this address data to provide notice of the data breach to affected class members, as it was required to do by statute. And Rosario's proposed settlement class consists solely of people who were sent these notices. Mr. Amaya, I guess there isn't any kind of direct evidence of the citizenship side, the state citizenship side, which is this combination of domicile and U.S. citizenship. Adams was looking for a third of the class, just like here. But there it was 90% had been determined to be residents. And there we found it was enough to be a cushion. Cushion's smaller here, and I'm wondering how we're supposed to know whether that's enough. I think the cushion is smaller in that there's a higher proportion of California residents and, you know, by inference, domiciles. It was 96 out of, like, 1,800. I thought Adams was, like, more than 90% there. And I think, right, if we use a different denominator, if we're looking at the complaint here, we're down to two-thirds and you take some off the top. The cushion's smaller here, and I'm just trying to figure out how we're supposed to know that's enough. Okay. We have 701 addresses that were confirmed to be outside of the state of California. 16,251 of the notices that were issued were returned as undeliverable. In addition, there were 33,185 victims of the data breach, I would characterize them, affected individuals for whom PIH lacked address information. I don't see a reason why anyone would assume that those people were primarily out-of-state citizens. By that number, I'm not sure exactly. I've been trying to keep up with the math along the ways, but I'm not sure at that point it needs to be primarily. I think we're down to, what, closer to half rather than 90%. I don't think so. 701 non-California addresses, 16,251 return mailings, plus 33,185 for whom they had no addresses comes to about 40,000 total. I think it's an unreasonable assumption to assume that all of those people… 40,000 off of the top of the settlement class. No, that would be out of the larger number. Okay. So, if we're talking about the larger number, which is roughly 200,000, the math's a little easier if we look at that. One-third, we're talking about 66,000-something in that neighborhood. It's certainly higher than 40,000, which you have to assume that every single one of these categories I just laid out consists entirely of non-California citizens. To get just to 40,000, that's still not a third of the 198,000 larger number. So, we can't – at most, the use of the smaller number was harmless error by the district court. However, I would submit it wasn't even that. The court was entitled to look at the composition of the settlement class before it in the settlement agreement that it was being asked to approve. Doesn't the nature of the business factor in greatly here? If this was a mail-order catalog where people are buying this from wherever, maybe we regard the addresses one way. But my understanding is these are hospitals, and most people go to a hospital near where they live. Absolutely, Your Honor. And there's evidence in the record showing that this is a regional health care provider that, by its own description of its services, serves primarily Los Angeles County. It's based in Whittier. I think it was Los Angeles and San Bernardino counties. Anyways, it's not even on the border of California. So, I think absolutely that's a fact that also suggests that we are looking at a truly intrastate matter here, which was the district court's central conclusion. And CAFA was not enacted with the intent of pulling truly intrastate matters into federal court. Some of the briefs in this case refer to your client as a proposed intervener. Did the district court ever grant you intervention into the case? I believe not. Does that matter? No, because the court dismissed the matter, dismissed it, which we were seeking dismissal. No, I understand, but it's a somewhat strange posture. It's almost as though you came in and you were essentially an advisor or an amicus to the court, if you're not an actual party. We did file – I think we were parties. We did file a complaint and intervention.  Yeah, we did seek that. We did file a complaint and intervention with our papers. Also, with the limited time I have, I did want to alert the court to a decision that was issued after we filed our brief in this matter out of the Fourth Circuit called Skyline Tower Painting, Inc., v. Goldberg. The site is 148F4209. It's from the Fourth Circuit, August 1st, 2025. It relies heavily on the Adams case issued by this court. To conclude, essentially I'm paraphrasing here that proof of residence, such as mailing address information, creates a rebuttable presumption of citizenship for purposes of analysis of CAFA's home state exception. So I think that's authority worth reviewing and considering in the course of this decision. And, Your Honors, at the end of the day, I think it's clear that the district court made the ruling that's challenged here based on a robust factual record and after a transparent process in which appellant had every opportunity to participate and frequently did participate. Her decision not to submit any briefing in response to the district court's order requesting additional briefing on the discretionary home state exception and not to submit anything in response to the district court's ruling dismissing the case on that basis, including during the 21 days the district court stayed that order, seems to have been strategic and voluntary. Substantively, there's no reason to reverse the district court's well-reasoned opinion here. What's happening in the state court? I mean, I take it your position would be that you actually already represent the same putative class in the state court? That's correct, Your Honor. And there was a misrepresentation of fact in the reply brief. Those actions are proceeding. Discovery is underway. There was a second data breach by PIH in 2024 which spawned additional cases which have been related in the same superior court proceedings where we are lead counsel. And so those two groups of actions are coordinated and they're proceeding. Is there any other federal case pending against PIH relating to these data breaches? Not to my knowledge. Not to my knowledge. I hope not. Your Honors, unless you have any more questions, I think I am concluded.  Thank you, Mr. Maia. Thank you. Good morning, Your Honors. May it please the court. Brian Leifer on behalf of Defendant PIH Health, a nonprofit charitable hospital network. I just wanted to address a few things. I'm also counsel in the current state court matter. That action was stayed while the federal court action was pending. Judge Dillon in the state court lifted that stay. It's proceeding now, but it's in its very early stages. No class certification deadline has been set. Only one deposition has been taken in that case. To address some of the questions by the judges, I'd like to go back to the NCOA issue, the address search that was conducted quite some time ago. So notices were mailed out after the data security incident early January of 2020. The NCOA search was done a few weeks before that, likely in December of 2019. The complaint, the federal court complaint here, was filed September 2021. So we're looking at almost two years. The NCOA search was conducted almost two years prior to that federal court action being filed. We looked at about four years prior to a complaint being filed for, you know, who the putative class members are. So that's quite some time in terms of updated mailing addresses. Is there any evidence? I mean, there's I think the Postal Service as well. There's data out there in terms of how often Americans, Californians move, change states. Was any of that before, right? Because we're trying to figure it. We don't want to do guesswork on either side of this. Did anyone substantiate this concern about stale addresses with some percentage of people that should create a presumption that more than half of the class had moved? We raised the issue below, and I believe it was cited in the appellate briefing about, or at least in the excerpt, it's about the huge number of people who have left California. Huge, but numbers, citations, I mean, there is data behind this. Yeah, I mean, I think we cited, I think there was arguments below citing some study about a substantial portion of people. I don't recall. Not half, though. I don't think half of Californians. If we had numbers here that were even in the most favorable denominator closer to one-third, then some of these points start to get some traction. But we're nowhere near those numbers, even giving you the most favorable inferences. And then on top of that, the nature of your client's business as a regional health provider, I think, is a significant impediment to some of these arguments. Well, Your Honor, in terms of the loss of individuals in California, I mean, I understand that there's been a new census data. I believe that California has lost a number of congressional seats. I think that's verifiable data that the court could take judicial notice of. With respect to the idea that it is a regional hospital, that is true. But it's all, and this kind of gets back to what Judge Graber was saying, her question relating to taking judicial notice of, like, a particular area. PIH Health has facilities all over Southern California. So it's very, very difficult to be able to track, you know, maybe the unhoused, the transient population, to be able to figure out that situation. But would they be more or less likely to have left California, the country? I would say much more likely. I mean, I think that's verified just publicly by the amount of— Where in the record? Where is it before the district court? I believe we cited it in the briefing, but it was just simply, I think it was a website reference, a reference that a lot of people had moved out of California. Because I think at that time when we were briefing, that was, I mean, during COVID, I think a lot of people had started to move out. And to, you know, going back to addressing this DeNova review issue, I mean, if we take a look at the court's ruling, I mean, the court entirely relied on the settlement class number in its decision. And that's just not the law. The law is what is the number of class members at the time of the filing complaint, which is about 199, 198,000. Was this point made to the district court? Yes, multiple times. I mean, throughout briefing, multiple times. So nothing happened for years in this case. So we basically filed something and said, hey, you know, Your Honor, we have a pending motion for final approval of class action settlement. We had settled this case and we were just hoping to get a ruling on preliminary approval so we could settle this case. And the court asked for the briefing and then just issued this order. And that was that. So, you know, there's a portion of the statute in the CAF relating to, you know, national interests. And without even going to these six factors, there has to be something about the interest here of class member relief, of getting credit monitoring, identity monitoring, you know, potential for payment relief. And really for us as a defendant, we're a nonprofit hospital operating on very thin margin to not have to deal with years of litigation. If this continues in the state court matter, we're still at the early stages. It could be years before any class members get relief. So I believe I'm a little bit over time. Let me see if there's any further questions from my colleagues. OK, well, hearing none, I want to thank you for your presentation. We thank both counsel for the presentations and that matter will be submitted. Thank you. Thank you all.
judges: GRABER, BRESS, JOHNSTONE